Grimm, Appellant, *v.* Pittsburgh.

Argued March 21, 1963. Before Bell, C. J., Musmanno, Jones, Cohen, Eagen, O'Brien and Roberts, JJ.

*Hymen Schlesinger,* for appellant.

*Robert Engel,* Assistant City Solicitor, with him *David W. Craig,* City Solicitor, for City of Pittsburgh, appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 16, 1963:

This case is an illustration of how a complaining party's case may possibly come to an undesired end because of the dilatoriness of counsel, of client, or of both. The accident, which is the subject of the litigation, occurred in December, 1946. The ensuing legal proceedings did not reach final determination until October, 1962, nearly sixteen years later. This delay was not due to the asserted "backlog" currently under discussion.

On December 15, 1946, the plaintiff, James Grimm, was injured when he fell, as the result of departing from wooden steps attached to the hill he was descending and attempting to cross a rugged path which paralleled the stairway. He testified that in making his way over a shallow concrete gutter in the center of the path his right foot slipped and then his left toe caught in a hole alongside the gutter, causing him to fall. At the trial he was asked to describe the hole which was his undoing. All he could say was that it was a "small hole." Both his own counsel and the attorney for the defendant sought to have him indicate the nature of the hole. The most he said was that it was big enough to catch his toe. Although he probably meant the toe of his shoe, he kept repeating that the hole was just big enough to catch his toe.

When he was asked specifically to describe the hole he testified: "Well, there was a small hole there beside the gutter where I stepped across there big enough to catch my toe in and throw me."

Nothing could induce him to amplify this meager description. At least five different times he said that the hole was that kind of a hole that one's toe goes into. Since toes differ in size and occasionally in configuration, the plaintiff's description offers little for an appellate court from which to visualize the alleged earthen irregularity which precipitated the plaintiff's fall. Nor was the scant portrayal of the offending hole due to lack of opportunity on the part of the plaintiff to study the hole. His attorney asked him: "How long were you lying in that spot afterwards?" (After the fall). He replied that he was there about forty minutes. His attorney then asked: "And while you were lying there did you have occasion to examine that hole, the area?"

The plaintiff replied in the affirmative. This then followed: "Q. What did you observe about it? A. Well, I observed—Q. Describe it. A. Well, there was a small hole there beside the gutter where I stepped across there big enough to catch my toe in and throw me. Q. By small what do you mean? A. Well, it's hard to describe. Q. Illustrate to the Jury, can you? . . . A. Hard to describe an irregular hole. Just big enough to catch your toe and throw you. Q. Can you tell us how wide or how long or what? Anything to give us any estimate. . . . A. My answer, the hole was big enough for any toe to go in. That is as near as I can describe it. Q. You said that you examined the hole? A. Yes. Q. What did you observe about it? A. Fresh impression where my toe had went in the hole."

The probable explanation for the plaintiff's inability to describe how the accident occurred was that time, with its erasing sponge, had wiped away the delineat-

ing marks of memory and left in recollection only a hole, a hole big enough in which to insert a toe. In fact, the plaintiff testified to that effect. When he was asked just what he was doing when he fell he replied: "My memory is not that clear. *Been some time ago.*"* Sixteen years.

In April 1947, he took pictures of the scene of the accident. At the trial he was asked to identify some of those pictures. He replied: *"I am not sure of it that is so long ago. I am not sure."* Also, "I took pictures in April, 1947, but I am not sure which ones."

When the plaintiff fell in 1946 he was a young man, 21 to 22 years of age. At the time of the trial he had reached the age of man's infinite responsibilities, and many things had undoubtedly fought for possession of his mind, to the exclusion of the memory of that fall of sixteen years before.

The accident, as stated, occurred on December 15, 1946, and the plaintiff filed an action of trespass against the City of Pittsburgh, averring that the Maurice Street steps, which he stated he had been compelled to leave because they were in a state of disrepair, had been negligently maintained by the City. The case came on for trial and a compulsory nonsuit was entered. A new suit was filed but nothing was done to prosecute it for nearly nine years. It was finally nonprossed on June 27, 1957, because the plaintiff failed to offer a satisfactory explanation for his failure to proceed with his lawsuit. The non pros was removed on May 5, 1959. The case then came on for trial on May 3, 1962, but the jury disagreed. The defendant then moved for judgment on the whole record. The motion was granted. This appeal followed.

Second Avenue in Pittsburgh, the street for which the plaintiff was heading on his way to work the morn-

---

* Emphasis supplied.

ing of December 15, 1946, can be reached from the higher Forbes Street via two sets of steps: one known as the "Brady Street Steps", and the other known as the "Maurice Street Steps." The Brady Street steps were constructed of steel and concrete, the Maurice Street steps of wood. For a period of four months, five days a week, the plaintiff used the formidable, modern Brady Street steps in getting to Second Avenue on the way to his job as crane operator at the Jones and Laughlin Steel Company mill. The Brady Street steps were not only sturdy, solid and substantial, but they were enclosed on both sides by equally durable hand railings so that one could doubly assure himself against slipping, in the event of inclement weather, by grasping the rail on either side. For approximately sixty-five consecutive working days the plaintiff had used these Gibraltarean steps.

On the morning of the accident he decided to deviate from his usual approach to Second Avenue. In explaining the reason for this deviation he testified: "I was told it was nearer by other workers in the mill and I decided that morning to try the route."

Later on in his testimony he gave another reason for the deviation. He said that on the day preceding the accident the Brady Street steps were ". . . slippery due to the smooth surface of the steps. The handrails were smooth and I can only give my opinion of them. They were dangerous."

He could give no explanation as to why they were more dangerous on Dec. 15, 1946 than they had been for sixty-five continuous working days. Indeed, he did not even see the Brady Street steps on the day of the accident. Nor was the weather such as to proclaim general slipperiness. He was asked as to the state of the weather that day. His answers were as follows: "Q. Do you remember what the weather was like? A. It was a normal, clear day. Normal winter day—

no snow, no rain. Q. No ice? A. No ice. Q. No sleet?
A. No sleet."

He also stated it was a dry day. He didn't recall
whether there were any clouds. Thus, there was no
reason, by the plaintiff's own testimony, to depart from
a safe passage only because of his cloudy testimony
that the Brady Street steps were "dangerous."

The evidence is clear and dry that James Grimm
departed from an obviously safe route of travel to pro-
ceed over an obviously not-as-safe route. The person
who goes over the rapids in a frail boat, when he could
just as conveniently have gotten to his destination by
a water route around the rapids, has only himself to
blame if the boat capsizes and he emerges from the
turbulent stream, dripping with contributory negli-
gence.

The appellant's attorney argues that the Brady
Street route, in addition to being "very dangerous",
was "also longer in distance and time." The plaintiff
traveled by streetcar to the Maurice Street car stop.
He stated that the Brady Street stop was only about
2000 feet beyond Maurice Street. The defendant City
submits that Grimm could have remained on the street-
car until he got to Brady Street and there board an-
other car which would have taken him to the mill.
Grimm admitted that "there were four cars that ran
out there: I believe 55, 56, 57 and 58." The City
maintains that the normal running time between the
two indicated points would be only about two minutes.
The plaintiff said that the time "varied depending on
the amount of traffic." In any event, it is apparent
that there would not have been a great loss of time in
proceeding to Brady Street and then to the mill. For
one who neglected the prosecution of his lawsuit for
nearly a decade, it is a strange argument that two or
five minutes, where wholeness of body and soundness
of limb are involved, would have been too great a time
to expend in the interests of safety.

The learned Court below, in entering judgment for the defendant on the whole record, cited *Burns v. City of Pittsburgh*, 320 Pa. 92, in support of its decision. The citation amply justifies the Court's decision, and the judgment is, therefore, affirmed.

Mr. Justice COHEN and Mr. Justice ROBERTS concur in the result.